<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit

No. 98-1222

                 AMELIA BARRETO-RIVERA, ET AL.,

                    Plaintiffs, Appellants,

                               v.

                 LUIS R. MEDINA-VARGAS, ET AL.,

                     Defendants, Appellees.

        ON APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

      [Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

                             Before

                 Stahl, Lipez, Circuit Judges,
             and Reavley,* Senior Circuit Judge.
                                
 

 Raul S. Mariani Franco with whom Carlos M. Hernandez
Lopez, Juan C. Cancio Reichard, and Cancio & Cancio Reichard were
on brief for appellants.
 John F. Nevares with whom Lizzie M. Portela and Smith &
Nevares were on brief for appellees.

February 18, 1999

                                
*Of the Fifth Circuit, sitting by designation.

 LIPEZ, Circuit Judge.  Plaintiffs, relatives of decedent  
Arstides Ortega-Barreto ("Ortega-Barreto"), brought suit under 42
U.S.C.  1983 against defendants Luis Medina-Vargas ("Officer
Medina-Vargas"), a police officer of the Commonwealth of Puerto
Rico, and his supervisor at the Puerto Rico Police Department,
Superintendent Pedro Toledo-Dvila ("Toledo-Dvila").  Plaintiffs
alleged that Officer Medina-Vargas, acting under color of state
law, used excessive force to shoot and kill Ortega-Barreto.  The
district court disagreed and granted summary judgment in favor of
defendants, concluding that the fight between the two men that led
to Ortega-Barreto's death was personal in nature and thus Officer
Medina-Vargas was not acting under color of state law when he shot
Ortega-Barreto.  After a careful review of the record, we conclude
that there are genuine issues of material fact that preclude the
entry of summary judgment.  Accordingly, we vacate the judgment and
remand for further proceedings.  
I. Background
 We recite the facts in a light most favorable to the
nonmoving party, making all reasonable inferences in that party's
favor.  See Martinez v. Colon, 54 F.3d 980, 980 (1st Cir. 1995).  
On April 28, 1995, Ortega-Barreto left his house and went to a
local store to purchase cigarettes and beverages.  As Ortega-
Barreto drove home from the store, Officer Medina-Vargas followed
Ortega-Barreto in his police cruiser and attempted to force Ortega-
Barreto to pull his car over to the side of the road.  Ortega-
Barreto refused to stop his vehicle and Officer Medina-Vargas
chased Ortega-Barreto back to his house.  Officer Medina-Vargas
parked behind Ortega-Barreto and said, "Come here, I want to talk
to you."  He then demanded Ortega-Barreto's driver's license and
vehicle registration.  Ortega-Barreto told him that he had the
vehicle registration, but he did not have a license.  An argument
ensued and the men shouted profanities at each other.  Ortega-
Barreto told Officer Medina-Vargas, "You got fresh or made a pass
at my wife," to which Officer Medina-Vargas responded, "You are
fresher because you have abused many old folks around here."  The
two men began to throw punches at each other and Officer Medina-
Vargas repeatedly hit Ortega-Barreto with his night stick.  The men
were separated and Ortega-Barreto retreated into his house.   
 At that point, Ortega-Barreto's uncle and mother
approached Officer Medina-Vargas.  Officer Medina-Vargas pushed
Ortega-Barreto's uncle to the ground and shoved his mother.  Upon
seeing his family assaulted, Ortega-Barreto left his house, went
into his yard and picked up a piece of plastic tube.  He started
toward Officer Medina-Vargas with the tube in his hand.  Although
several witnesses were able to take the tube from him, Ortega-
Barreto continued to approach Officer Medina-Vargas.  As Ortega-
Barreto approached, Officer Medina-Vargas radioed for back up
stating: "10-50, I have been attacked.  Hurry up, this guy is
acting tough and I am going to have to shoot him."  Police
Lieutenant Jose Francisco Cruz-Feliciano told Officer Medina-Vargas
to calm down and that help was on the way.   Ortega-Barreto,
standing approximately six to eight feet from Officer Medina-
Vargas, told Officer Medina-Vargas to drop his gun and to fight
with his fists.  Officer Medina-Vargas instructed Ortega-Barreto
not to come any closer or he would shoot.  Ortega-Barreto continued
to approach, empty handed, and Officer Medina-Vargas shot him in
the stomach. Ortega-Barreto fell to the ground.  Bystanders yelled
at Officer Medina-Vargas that he had killed Ortega-Barreto.   
Officer Medina-Vargas responded that if Ortega-Barreto got up, he
would shoot him again.  Ortega-Barreto was pronounced dead at the
hospital.   
 On April 26, 1996, plaintiffs filed a complaint under 42
U.S.C.  1983 in the United States District Court for the District
of Puerto Rico alleging that Officer Medina-Vargas's conduct
violated Ortega-Barreto's civil and constitutional rights.  The
complaint further alleged that Superintendent Toledo-Dvila was
liable for Officer Medina-Vargas's conduct because he failed to
control, supervise and discipline Officer Medina-Vargas despite
Toledo-Dvila's knowledge of Officer Medina-Vargas's disciplinary
problems.  Officer Medina-Vargas failed to answer the complaint and
a default judgment was entered against him on January 14, 1997.  
The case then proceeded against Superintendent Toledo-Dvila on the
claim of supervisory liability.  Toledo-Dvila filed a motion for
summary judgment, arguing that Officer Medina-Vargas's actions were
not under color of state law and thus no supervisory liability
could be attributed to Toledo-Dvila under 42 U.S.C.  1983.  The
motion was granted by the court on November 24, 1997, and
plaintiffs' complaint was dismissed.  This appeal followed.
 As noted above, there was a default judgment entered
against Officer Medina-Vargas.  Nevertheless, to determine whether
Superintendent Toledo-Dvila could be liable under a theory of
supervisory liability, we must first determine if there are genuine
issues of material fact relating to whether Officer Medina-Vargas
was acting under color of law when he shot and killed Ortega-
Barreto.  Only then do we reach the issue of whether there are also
genuine issues of material fact relating to Toledo-Dvila's
responsibility for Officer Medina-Vargas's conduct.  
II. Discussion
 Federal Rule of Civil Procedure 56(c) permits a court to
enter summary judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter  of law." Fed. R. Civ. P. 56(c).  Our review is de novo
and we evaluate the record in a light most favorable to the
nonmoving party, "indulging all reasonable inferences in that
party's favor." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576,
581 (1st Cir. 1994).  Although we will not credit unsupported
speculation,  "the nonmoving party is entitled 'to have the
credibility of his evidence as forecast assumed, his version of all
that is in dispute accepted, [and] all internal conflicts in [the
evidence] resolved favorably to him. . . ." Greenburg v. Puerto
Rico Maritime Shipping Auth., 835 F.2d 932, 935 (1st Cir.
1987)(quoting Charbonnages de France v. Smith, 597 F.2d 406, 414
(4th Cir. 1979)).  Put another way, in evaluating a motion for
summary judgment, we must determine "whether the evidence presents
a sufficient disagreement to require submission to a jury or
whether it is so one-sided that one party must prevail as a matter
law." Anderson v. Liberty Lobby, Inc.,  477 U.S. 242, 251-52
(1986).
A. Liability under 42 U.S.C.  1983
 To state a claim under section 1983, a plaintiff must
allege two elements: 1) that the conduct complained of has been
committed under color of state law, and 2) that this conduct worked
a denial of rights secured by the Constitution or laws of the
United States. See Martinez v. Colon, 54 F.3d 980, 984 (1st Cir.
1995).  In analyzing the first element in this case -- namely,
whether the conduct of the police officer involved private violence
or violence attributable to state action -- we have warned that
courts must avoid simplistic solutions. See id. at 986.  No single,
easily determinable factor will control whether a police officer
was acting under color of state law.  See id.  While certain
factors will clearly be relevant -- for example, a police officer's
garb, an officer's duty status, the officer's use of a service
revolver, and the location of the incident -- these factors must
not be assessed mechanically.  See id. at 986-87; Parrilla-Burgosv. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997).
    In Martinez, we explained that "whether a police officer
is acting under color of state law turns on the nature and
circumstances of the officer's conduct and the relationship of that
conduct to the performance of his official duties."  Martinez, 54
F.3d at 986.  Such an evaluation requires an assessment of the
totality of the surrounding circumstances, see id. at 987, and
"[t]he key determinant is whether the actor, at the time in
question, purposes to act in an official capacity or to exercise
official responsibilities pursuant to state law,"  id. at 986.   In
applying these principles to the facts at issue in Martinez, we
concluded that an on-shift officer who shot and maimed a fellow
officer was engaged in a "personal frolic" and not acting under
color of state law. Id. at 987.  The on-shift officer relentlessly
harassed Martinez over a period of time, verbally abusing him,
pointing his gun first at Martinez's stomach and then later at his
groin, taunting him and asking Martinez if he was scared.  
Throughout these encounters, the officer never asserted his
authority as a police officer.  We concluded that he "was bent on
a singularly personal frolic: tormenting an acquaintance." Id.  In
the case of an officer against officer dispute, the limited indicia
of state action, i.e., use of his police weapon, his on-shift
status and his uniform, were not enough to establish that the
officer "exercise[d], or purport[ed] to exercise, any power (real
or pretended) possessed by virtue of state law. . . . Though on
duty and in uniform, [the officer's] status as a police officer
simply did not enter into his benighted harassment of his fellow
officer." Id.  
    More recently, in Parrilla-Burgos, we again addressed the
parameters of police conduct allegedly carried out under color of
state law. Parrilla-Burgos, 108 F.3d 445.  A police officer shot
and killed a bar patron during a fight outside of the bar.  See id.at 446-47.  The officer was on medical leave and, although he was
not in uniform, he was carrying his police identification and
service revolver.  The officer went to the bar with a group of
friends where he encountered the decedent.  See id. at 446.  
Threats were made and the officer told decedent: "I'll look at you
whichever way I please, because I am a cop."  The situation
escalated and again the officer told decedent that, "I look at
anybody I want, because I am a cop.  Anybody I decide I want to
look at dirty, I look at them dirty."   Id. at 447.  A crowd
gathered around the men and apparently the officer showed his
identification and told the crowd that he was there to keep the
peace.  Although this act controlled the situation for a few
minutes, tensions increased shortly thereafter.  See id.  While
still in the bar, the decedent challenged the officer and stated,
"Well, you leave the gun and me and you will have it out, outside."  
The officer responded, "I don't need a gun to fight you. Come on,
step outside."  The men did step outside, but the officer brought
his gun.  Almost immediately, as they began to fight, the officer
pulled out his weapon and shot the decedent six times.  See id.  
    On the basis of these facts, we concluded that, even
though some factors weighed in favor of finding that the officer
was acting under pretense of law by purporting to act in his
official capacity, i.e., comments that the officer was in the bar
to keep the peace and his display of his identification, most of
the officer's conduct demonstrated that he was acting in a private
capacity. See Parrilla-Burgos, 108 F.3d at 450-51.  We noted in
particular that in the final moments of the confrontation, the
victim invited the officer to engage in a private brawl and there
was no further pretense of official action.  See id.
B. Application of the Standards
    In concluding that Officer Medina-Vargas was not acting
under color of state law, the district court relied heavily on two
interactions between Officer Medina-Vargas and Ortega-Barreto's
wife that occurred prior to April 28.  In Ortega-Barreto's wife's
deposition, she testified that her husband and Officer Medina-
Vargas were acquaintances and there had never been trouble between
the two men.  By contrast, she had experienced some difficulties
with Officer Medina-Vargas.  A few weeks before the shooting,
Officer Medina-Vargas had seen her driving with a mechanic who did
not have a license.  Officer Medina-Vargas stopped her and warned
her that if he saw her allowing a person to drive her car without
a license, he would file a complaint against her.  He also told her
that "if I see you like that again our friendship will not be the
same as before."  Ortega-Barreto's wife thought this comment was
strange because she "did not have any friendship with Medina, only
that I would greet him whenever I saw him and because he would pass
time with my husband."   
    She then described a later incident when Officer Medina-
Vargas  passed by while she and her children were sitting in their
car.  He "made an expression with his mouth like when you are going
to blow someone a kiss but I don't know whether he did it to my
boys or me, but he fixed his look on me.  I had noticed Medina
being somewhat strange and I had already told my husband."  
Although the court appropriately considered this deposition
testimony in evaluating the motion for summary judgment, it was not
entitled to draw inferences favorable to the defendant as to the
"true" nature of the relationship between Officer Medina-Vargas and
Ortega-Barreto's wife.  The court stated:  
    Medina's true purpose in creating the
    encounter became obvious when Ortega accused
    Medina of making a pass at his wife.  Medina's
    prior actions toward Ortega's wife are
    indicative of the personal nature of his
    relationship with Ortega and his intentions
    when he intervened with him.  Medina had been
    acting strangely around Ortega's wife, to the
    effect that he was requesting sexual and love
    favors from her.  The love feud which was the
    cause of Medina's intervention then became
    evident.

Barreto-Rivera v. Medina-Vargas, 988 F. Supp 28, 32 (D.P.R. 1997).  
The court's analysis includes further references to the
relationship between Officer Medina-Vargas and Ortega-Barreto's
wife: "The case at issue . . .  is the story of a man who felt
unrequited love, hate, jealousy towards the husband of a woman he
wanted," id.; "jealousy, which was mutual between Medina and
Ortega, had taken over for some time and was the underlying
personal relation between them," id.; Officer Medina-Vargas's acts
"were acts of a personal nature, in which the pent-up emotions of
one man raged against those of another who wanted to have his wife
and vice versa," id.  
    These statements about a "love feud" are improper
inferences drawn against the nonmoving party on a motion for
summary judgment.  There was no evidence in the record that Officer
Medina-Vargas was requesting sexual favors from Ortega-Barreto's
wife.  There was scant evidence to support the finding that Officer
Medina-Vargas pursued Ortega-Barreto on April 28th because of a
love feud.  
    In discussing the significance of Officer Medina-Vargas's
call for back up on his police radio in the final moments of the
confrontation, the court again drew an improper inference from the
evidence in support of the defendants. Acknowledging that the call
for back up "could constitute an act in official capacity", id.,
the court went on to speculate that "Medina may have made the call
in order to shoot Ortega and argue self-defense, knowing Ortega's
volatility." Id. at 33.  Such speculation adverse to the nonmoving
party is inappropriate on a motion for summary judgment.
    The court also placed undue emphasis on the subjective
reactions of the victim to the confrontation with Officer Medina-
Vargas.  For example, the court states that "Ortega's reaction to
Medina's pointing a gun in his direction was not that of a citizen
confronting a police officer, but rather, as in Parrilla-Burgos,
that of a participant in a private brawl."  Id.   The court further
observed that the victim's actions were "not the acts of a person
heeding another's status as a policeman; instead, they reflect
Ortega's total disregard for Medina's official position."  Id.  
Although we accorded the subjective reactions of the victim some
relevance in the color of law analysis in Martinez and Parrilla-
Burgos, the primary focus of the color of law analysis must be on
the conduct of the police officer.  Cf. Pitchell v. Callan, 13 F.3d
545, 548-49 (2d Cir. 1994)(noting that plaintiff's argument
"erroneously centers on [the victim's] subjective reaction to [the
officer's] conduct rather than the nature of [the officers']
activity, and misses the essence of the color of law requirement
and the protection afforded by section 1983").
    Officer Medina-Vargas was on duty, in uniform, patrolling
in his police cruiser. Cf. Pickrel v. City of Springfield, 45 F.3d
1115, 1118 (7th Cir. 1995)(remarking that police uniform, wearing
of gun, and marked squad car parked outside of building were all
indicia of state authority).  Relying on his authority as a police
officer, Officer Medina-Vargas attempted to stop Ortega-Barreto
while he was driving his car home from the store.  Cf. Black v.
Stephens, 662 F.2d 181, 188 (3d Cir. 1981)(finding that on-duty
officer, dressed in police academy windbreaker, who pulled over
vehicle to investigate whether driver was intoxicated was acting
under color of law).  Pursuant to his police powers, he demanded
Ortega-Barreto's license and registration. When the two men began
to fight, Officer Medina-Vargas forced Ortega-Barreto to submit
with the use of his nightstick, a police-issued weapon and a potent
symbol of police authority. See Barna v. City of Perth Amboy, 42
F.3d 809, 818 (3d Cir. 1994)(noting that a police-issued nightstick
is "an objective indicia of police authority").  When Ortega-
Barreto came out of the house in the final moments of the
confrontation and challenged Officer Medina-Vargas to put down his
weapon, Officer Medina-Vargas used his police radio to request
assistance from other police officers.  Cf. United States v.
Tarpley, 945 F.2d 806, 809 (5th Cir. 1991)(noting that fact that
off-duty police officer summoned another officer to home where
officer was assaulting plaintiff was of particular significance in
concluding that officer was acting under color of law).  He then
shot and killed the advancing, unarmed Ortega-Barreto with his
service revolver.  Reviewing the "nature and circumstances" of
Officer Medina-Vargas's conduct and the "relationship of that
conduct to the performance of his official duties," see Martinez,
54 F.3d at 986, we are unwilling to say that Officer Medina-
Vargas's conduct was so clearly personal in nature that a jury
could reach only one outcome.  To the contrary, on this summary
judgment record there remains a genuine dispute about that issue.  
We must therefore vacate the court's entry of summary judgment.
C. Supervisory Liability
    A supervisor may be found liable under section 1983 on
the basis of his own acts or omissions; liability may not be
predicated upon a theory of respondeat superior. See Maldonado-
Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir.
1994)(citing Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561
(1st Cir. 1989)).  A supervisor may be found liable if the
"supervisor's conduct or inaction amounted to a reckless or callous
indifference to the constitutional rights of others." Gutierrez-
Rodriguez, 882 F.2d at 562.  "[E]ven if a supervisor lacks actual
knowledge of censurable conduct, he may be liable for the
foreseeable consequences of such conduct if he would have known of
it but for his deliberate indifference or willful blindness, and if
he had the power and authority to alleviate it."  Maldonado-Denis,
23 F.3d at 582.   
    A plaintiff must also show that there is "an 'affirmative
link' between the street-level misconduct and the action, or
inaction, of supervisory officials." Gutierrez-Rodriguez, 882 F.2d
at 562 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).   
    This causation requirement can be satisfied
    even if the supervisor did not participate
    directly in the conduct that violated a
    citizen's rights; for example, a sufficient
    [causal] nexus may be found if the supervisor
    knew of, overtly or tacitly approved of, or
    purposely disregarded the conduct.
    Consequently, deliberate indifference to
    violations of constitutional rights can forge
    the necessary linkage between the acts or
    omissions of supervisory personnel and the
    misconduct of their subordinates.

Maldonado-Denis, 23 F.3d at 582.  A plaintiff can establish a
causal link "if there exists a known history of widespread abuse
sufficient to alert a supervisor to ongoing violations." Id.
    Officer Medina-Vargas's history in the police department
was troubled at best.  Despite failing the psychological component
of the police academy entrance exam, he was admitted to the school.
Over the course of his twenty-five year career, Officer Medina-
Vargas was disciplined thirty times for abuse of power, unlawful
use of physical force and/or physical assaults; six incidents led
to recommendations that he be dismissed from the force.  Toledo-
Dvila's first review of Officer Medina-Vargas's file came in 1992,
when  an investigating officer recommended his dismissal because he
had an extensive record of physical assaults and there had been no
apparent change in his behavior despite sanctions.  Ignoring the
recommendation, Toledo-Dvila imposed a fifteen day suspension.  
Two weeks later, Toledo-Dvila reviewed another disciplinary action
taken against Officer Medina-Vargas for the improper use of his
firearm three years earlier.  Following this review, Toledo-Dvila
reduced Officer Medina-Vargas's sanction from a thirty day
suspension imposed by the former superintendent to a two day
suspension.   
    There is clearly sufficient evidence in this record to
allow a jury to reasonably conclude that Toledo-Dvila displayed
deliberate indifference to Officer Medina-Vargas's propensity
toward violent conduct, and that there was a causal connection
between this deliberate indifference and Officer Medina-Vargas's
fatal confrontation with Ortega-Barreto.  
    Judgment VACATED.

</body>

</html>